IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| EILEEN Y. SMITH | : |  |
|  | : |  |
| v. | : | Civil Action No. DKC 10-2306 |
|  | : |  |
| THOMAS J. VILSACK | : |  |
|  | : |  |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination action is a motion to dismiss or, in the alternative, for summary judgment filed by Defendant Thomas J. Vilsack.[1] (ECF No. 7). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion will be granted.

**I. Background**

**A. Factual Background**

Unless otherwise noted, the following facts are uncontroverted. Smith has offered general allegations contesting some of Vilsack's proffered facts, but she failed to offer admissible evidence in support of those allegations.

---

[1] Vilsack is the Secretary of Agriculture. Smith sued him in his official capacity as the head of the agency that oversees the Animal and Plant Health Inspection Service.

Consequently, Vilsack's facts are largely treated as undisputed for purposes of this motion. *See* Fed.R.Civ.P. 56(e)(2)-(3).

Before July 2006, Plaintiff Eileen Smith worked for the United States Department of Agriculture ("USDA") as a Program Facility/Director and California Sterile Insect Technique Coordinator in Los Alamitos, California. Smith's position was part of the Western Region of the Plant Protection and Quarantine division of the USDA's Animal and Plant Health Inspection Service ("APHIS"). In July 2006, Western Regional Director Phillip Garcia reassigned her to a new position because of "organizational conflicts." (ECF No. 7-7, Garcia Dep., at 8). Smith then became Regional Program Manager ("RPM") within the same division but remained in California.

For her first three months as an RPM, Steve Johnson supervised Smith. In September 2006, Senior Regional Program Manager Judy Pasek replaced Johnson as Smith's supervisor. Sherry Sanderson, who was then supervised by Garcia, supervised Pasek. All of Smith's superiors were stationed in Fort Collins, Colorado.

## 1. Training and Travel

While working as an RPM, Smith was offered several training opportunities. In January 2007, for example, Smith was authorized to take an irradiation training course. A month

later, in February 2007, she attended an agroterrorism training course. From February 2007 to May 2007, Smith completed a 90-day temporary duty assignment in Riverdale, Maryland as part of a leadership program.

While on temporary duty in Maryland, she also received training at an APHIS Safety and Health Conference in Kansas City, Missouri in April 2007. Smith states that she had a meeting with Garcia during her trip that did not go well. In particular, Smith maintains that Garcia told her she had "no future in the Agency or even in the western region" and that she would "have to start over." (ECF No. 7-4, Smith Dep., at 20-21). Garcia denies making any such statement.

After her temporary duty in Maryland ended, Smith travelled to Fort Collins for two weeks, from July 8 to July 20. There, she received additional training on websites and data analysis. During the trip, on July 16, she also met again with her supervisors, Pasek, Sanderson, and Garcia. After talking with her about her role and responsibilities, they asked her to return to Fort Collins for a 30-day temporary duty assignment to help her better understand the regional office. Smith "pretty much left open" the question of when she would return, as she needed to attend certain medical appointments every two weeks over the next several months. (ECF No. 7-4, Smith Dep., at 37).

The next day, on July 17, Smith requested permission to attend an Avian Influenza Conference in Bethesda, Maryland. Pasek denied her request for the training, as she felt Smith had "other priorities for work assignments and travel." (ECF No. 7-5, Report of Investigation ("ROI"), at 237). A week later, on July 24, Smith emailed Pasek and explained that she wanted to attend another course – a three-day American Management Association ("AMA") training course in August costing over $1,600. Pasek denied the request, as her budget provided for only $1,200 in training for each individual and Smith had already received $1,800 in training for the year. When Pasek told her that the training request was denied, Smith revealed that she had already purchased the program with her government credit card and believed that the fee was non-refundable.[2] On August 1, Smith renewed her request to attend the Avian Influenza Conference, but Pasek again denied it, as she felt it was important that Smith complete her 30-day temporary duty assignment in Fort Collins first. Around the same time, Pasek suggested that Smith could break her 30-day visit into smaller trips to avoid conflicts with Smith's medical appointments.

---

[2] The government ultimately was able to recover the fee.

4

After taking three days of medical leave in August, Smith returned to work and began pressing her request to attend the Avian Influenza Conference once more. On August 30, for instance, Smith informed Pasek and Sanderson that she intended to approach the EEOC about the denial of her training request. In an August 31 telephone call with Pasek, Smith again raised the issue of the Avian Influenza Conference; Pasek refused to change her decision. During the same call, Smith insisted that she would not come to Fort Collins until 2008 because Pasek had denied her request to attend the Avian Influenza Conference.

The day after her telephone conversation with Pasek, Smith emailed Pasek, Sanderson, and Garcia.[3] The email reiterated that she felt the Avian Influenza Conference related to her job responsibilities. Smith also said:

> So until you make some effort to understand or learn to ask me for information before just deciding without understanding, we will just continue to be dysfunctional and disagreeable . . . which I find so unproductive, unreasonable and ridiculous, but that apparently is how you **all** want to operate . . . to find fault with everything

---

[3] The email stemmed from a request by Pasek that Smith provide documentation evidencing that she was an APHIS Safety Officer. Pasek originally did not believe that Smith was such an officer because there was no documentation in Smith's personnel file. Smith argued that her position as a Safety Officer justified her attendance at the Avian Influenza Conference.

I say or try to do . . . and to use my
medical and EEO situations against me . . .
and prevent me from attaining anything
related to my performance elements . . . I
already anticipate that my end of the year
evaluation will be very contentious . . .
pretty sad state of affairs . . .

And so there is no misunderstanding, and as
I stated over the phone, **I will not be
coming to Colorado anytime before January at
the earliest** . . . also, I would like to be
provided with exactly what I will be doing
over a 30 day period because I don't see
this time period to be very productive
either . . . all of this is a good example
of this . . . reading emails, documents, and
giving an opinion and drawing pretty
pictures with data off various websites is
not my idea of a good time or even being
remotely constructive . . . all of this and
coming to Colorado for 30 days is apparently
just a reason to be continually serving out
Phil's life sentence because of the bogus
circumstances of last year.

(ECF No. 7-5, ROI, at 250 (ellipses and bold in original)).

Pasek determined that the August 31 email merited a letter
of caution in response. Accordingly, after consulting with
Human Resources, Pasek sent Smith such a letter on September 7,
2007. The letter warned Smith that (1) the tone of her email
was inappropriate and disrespectful, (2) she inappropriately
went outside the chain of command in sending the email to
Sanderson and Garcia, and (3) she wrongfully disregarded
management decisions in refusing to travel to Colorado until
January 2008. Smith refused to sign the acknowledgement

indicating that she had received the letter, as she felt her comments were taken out of context. Nevertheless, she apologized for the email and explained that she did not wish to be disrespectful or inappropriate.

Following the issuance of the letter of caution, Smith received some additional training. In October 2007, for example, she received ethics training. Later, in February 2008, she attended classroom training in Oklahoma City. She was not permitted to attend the National Biocontrol Meeting in Colorado because, according to Pasek, "[t]ravel to that conference was limited to two people per state . . . [a]nd biocontrol was not a program area that [Smith] had direct responsibility for." (ECF No. 7-6, Pasek Dep., at 46).

### 2. Application for GS-13 Agriculturist Position

Also in 2007, Smith applied for an Agriculturist (Assistant Trade Director) position within the Phytosanitary Issues Management ("PIM") Staff. The position, a GS-13 position, was advertised in a vacancy announcement running from June 11 to July 2, 2007. The selecting official was Craig Fedchock, who received assistance in evaluating the applications from Fan-Li Chou, John Tyrone Jones, and Jennifer Lemly; Michael Guidicipietro also discussed the selection with Fedchock.

Neither Fedchock nor Guidicipietro were aware of Smith's prior EEO activity at the time the selection was made.

Fedchock ultimately selected Judith Macias, a woman, for the agriculturalist position on August 22, 2007. Fedchock chose Machias because her experience and qualifications exceeded that of the other candidates. In particular, Machias "had extensive experience working at the field level on many of the issues facing the PIM staff." (ECF No. 7-5, ROI, at 90). Machias' application confirms that she possessed significant trade-related experience. (ECF No. 7-5, ROI, at 161-190).

In the end, however, Smith was able to secure a new position in February 2008 as a national program manager. She was then stationed in Riverdale, Maryland.[4]

**B. Procedural Background**

Smith filed an administrative complaint in November 2006 asserting claims not at issue in the present case, principally relating to a decision by Garcia to transfer her to a different position.[5] She then filed a new complaint, raising seven new

---

[4] The parties disagree over whether Garcia provided a "good" recommendation when contacted by the selecting official for this position. That dispute is irrelevant to the present case.

[5] That case was dismissed and is pending on administrative appeal.

issues, on May 15, 2007 (with an amendment following on September 24, 2007).    The administrative judge decided to consolidate one of the issues in this new complaint with the earlier November 2006 filing, leaving six claims remaining in the later action.    The judge dismissed those six claims in an August 11, 2009 decision that was affirmed on appeal to the Equal Employment Opportunity Commission's ("EEOC") Office of Federal Operations ("OFO") on March 19, 2010.    *See Smith v. Vilsack*, Appeal No. 0120100039, 2010 WL 1178321 (E.E.O.C. Mar. 19, 2010), *reconsideration denied*, 2010 WL 2255030 (E.E.O.C. May 28, 2010).

On August 23, 2010, Smith filed a *pro se* complaint in this court raising the six issues presented in her later EEO complaint.    In particular, Smith maintains that she suffered six adverse employment actions because of gender discrimination and retaliation for prior EEO activity.    (ECF No. 1).    These adverse actions included:    (1) the letter of caution she received on September 7, 2007; (2) denial of leadership training on August 9, 2007; (3) Pasek's refusal to let her attend the Avian Influenza Conference; (4) a "management" prohibition on training or travel beginning on July 24, 2007; (5) Garcia's comments on April 26, 2007 in Kansas City; and (6) her non-selection for the Agriculturalist position on August 22, 2007.    (*Id.* ¶¶ 1-6).    She

seeks "a finding of discrimination," attorneys' fees and costs, and "emotional damages" of $100,000. (*Id.* at 3).

The Secretary moved to dismiss, and alternatively sought summary judgment, on January 7, 2011. (ECF No. 7). Pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Smith was notified by letter that the Secretary had filed a dispositive motion, the granting of which could result in the dismissal of her complaint. (ECF No. 8). The letter informed Smith that she was entitled to file materials in opposition to within 17 days, but that her case could be dismissed (or summary judgment entered) if she failed to illustrate, by affidavit or the like, a genuine dispute of material fact. (*Id.*). Smith filed an opposition on March 4, 2011. (ECF No. 12). The government replied shortly thereafter. (ECF No. 15).

## II.  Standard of Review

The government bases its motion on Rule 12(b)(1), Rule 12(b)(6), and Rule 56. The motion is not properly styled as a Rule 12(b)(1) motion because no part of it implicates the court's subject matter jurisdiction.[6]  In addition, a court

---

[6]  The Secretary likely anticipated that its administrative exhaustion argument, discussed below, would raise a jurisdictional issue. Although a plaintiff's failure to exhaust administrative remedies related to a Title VII claim deprives a federal court of subject matter jurisdiction, "the *untimeliness* of an administrative charge does not affect federal

10

considers only the pleadings when deciding a Rule 12(b)(6) motion to dismiss. Because the parties rely on matters outside the pleadings, the court will construe the motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b); *Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir. 2005); *Offen v. Brenner*, 553 F.Supp.2d 565, 568 (D.Md. 2008).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). In examining the record, the court must construe the facts presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

---

jurisdiction over a Title VII claim." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 301 (4th Cir. 2009) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). The Secretary's argument does not affect subject matter jurisdiction because it attacks only the timeliness of Smith's efforts.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). Moreover, unsubstantiated factual contentions found in the summary judgment briefs are simply not enough to stave off summary judgment. "The court is not required to scour the record looking for factual disputes and such unsupported factual assertions will not be credited." *Jurgensen v. Albin Marine, Inc.*, 214 F.Supp.2d 504, 510 (D.Md. 2002) (quotation marks and ellipses omitted).

Although pro se litigants are to be given some latitude, the above standards apply to everyone. Thus, as courts have recognized repeatedly, even a pro se party may not avoid summary judgment by relying on bald assertions and speculative arguments. *See, e.g., Price v. Reilly*, 697 F.Supp.2d 344, 352-53 (E.D.N.Y. 2010); *Johnson v. Deloach*, 692 F.Supp.2d 1316, 1323

(M.D.Ala. 2010); *Benckini v. Hawk*, 654 F.Supp.2d 310, 316 & n.1 (E.D.Pa. 2009); *Hammad v. Bombadier Learjet, Inc.*, 192 F.Supp.2d 1222, 1229 (D.Kan. 2002).

## III. Analysis

### A.   Timely Exhaustion of Administrative Remedies

In this action, Smith asserts Title VII claims of gender discrimination and retaliation based on six different incidents. As a threshold matter, one of these incidents – the comments allegedly made by Garcia on April 26, 2007 – may not be considered.   Federal employees alleging discrimination under Title VII must exhaust their administrative remedies in a timely fashion.   Among other things, federal employees "must initiate contact with a Counselor within 45 days of the matter alleged to be discriminatory."   29 C.F.R. § 1614.105(1).   Failure to comply with this timing requirement can result in dismissal (or, in this case, summary judgment).[7]   *See Lorenzo v. Rumsfeld*, 456 F.Supp.2d 731, 734 (E.D.Va. 2006) (citing *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 970 (4th Cir. 1985)); *see also Moret v. Geren*, 494 F.Supp.2d 329, 337–340 (D.Md. 2007).   Smith apparently waited until August 31, 2007, more than 120 days

---

[7]    Equitable tolling or estoppel could apply, but there is no argument that it should in this case.   There is no basis for these arguments evident in the record, either.

13

later, to raise an informal complaint concerning Garcia's comments on April 26, 2007. (ECF No. 7-5, ROI, at 1).

Smith maintains that the comment-based claims were timely because they were part of an "ongoing pattern" of conduct. (ECF No. 12, at 4). This argument is likely an attempt to invoke the "continuing violation" theory, which "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)). Such a theory only applies, however, when an employee asserts a hostile work environment claim. *Id.* (". . . part of a single, ongoing pattern of discrimination, *i.e., when the incidents make up part of a hostile work environment claim*." (emphasis added)); *see also Morgan*, 536 U.S. at 122 ("A charge alleging a *hostile work environment claim*, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."). There is no indication in the complaint (or even in the administrative proceedings below) that Smith intended to bring a hostile work environment claim. She cannot bring one now simply by hinting at it in her opposition to the

Secretary's motion. *See, e.g.*, *Bostic v. Rodriguez*, 667 F.Supp.2d 591, 615 (E.D.N.C. 2009) ("Plaintiffs may not use their response to amend their complaint."); *Caudill v. CCBCC, Inc.*, 651 F.Supp.2d 499, 510 (S.D.W.Va. 2009) ("Indeed, a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (quotation marks and brackets omitted)); *Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.*, 455 F.Supp.2d 399, 435-36 (D.Md. 2006); *see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F.App'x 556, 563 (4th Cir. 2008). Even when a plaintiff is *pro se*, she must bring her claims in the complaint, not in ad hoc additions in the midst of summary judgment briefing.

Smith also insists that the timeliness issue was already decided at the administrative level; she accuses the Secretary of "trying to reverse a decision that has already been decided." (ECF No. 12, at 5). The decision of the OFO indicates otherwise, as the office "determine[d] that [it was] unnecessary to address the agency's determination on appeal that complainant initiated untimely EEO Counselor contact regarding [the Garcia comments]." *Smith*, 2010 WL 1178321, at *4 n.3. Regardless, "a federal employee who brings a civil action in the district court must put his employing agency's underlying discrimination at issue [even] if the OFO accepts those allegations." *Laber v.*

*Harvey*, 438 F.3d 404, 419 (4th Cir. 2006); *accord Murchison v. Astrue*, 689 F.Supp.2d 781, 789 (D.Md. 2010) ("After the employee chooses the second route - appealing the agency's underlying decision - and the OFO either rules against the employee or orders a remedy the employee finds unsatisfactory, the employee again has the opportunity to seek a de novo civil action in federal court (putting the entire issue of discrimination in front of the court)."). Thus, the Secretary is not trying to rehash an issue already decided, as the OFO's legal conclusions have no relevance at this stage. "[A]dministrative *res judicata* does not operate in a Title VII suit." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (quotation marks omitted).

Because she failed to exhaust her administrative remedies in accordance with the applicable timing requirements, summary judgment must be entered on any claims premised on Garcia's alleged comments.

### B.   Gender-Based Discrimination

Title VII bars federal government employers from engaging in "any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16.[8] In her complaint,

----

[8]   "Notwithstanding the differences in wording, sections 2000e-2 and 2000e-16 generally have been treated as comparable,

Smith argues that she was the victim of such discrimination by virtue of her gender. Her opposition to the government's motion for summary judgment makes little mention of this claim.

Smith does not present any direct evidence of gender discrimination. Therefore, she would need to rely on the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to avoid summary judgment. Under that familiar standard, Smith must establish a prima facie case encompassing four elements: "(1) membership in a protected group, (2) qualification for the job in question, (3) an adverse employment action, and (4) circumstances supporting an inference of discrimination." *King v. Marriot Int'l, Inc.*, 195 F.Supp.2d 720, 723 (D.Md. 2002). The burden then shifts to the employer to provide some legitimate, non-discriminatory reason for the disputed action. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). If the employer can do so, the burden then shifts back to the employee, who must then demonstrate that the reason offered is in fact a pretext for discrimination. *Id.*

_____

with the standards governing private-sector claims applied to claims under section 2000e-16." *Bhella v. England*, 91 F.App'x 835, 844 (4th Cir. 2004).

### 1. Adverse Employment Action: Letter of Caution

As to the third element – an adverse action – the Secretary contends that some of the events cited by Smith do not constitute adverse actions. An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland*, 487 F.3d at 219. "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 737 n.6 (D.Md. 2009). "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F.Supp.2d 314, 329 (D.Md. 2003).

The letter of caution was not an adverse employment action. Generally, a "reprimand, whether oral or written, does not *per se* significantly affect the terms or conditions of employment," but only becomes an adverse action if it "works a real, rather than speculative, employment injury." *Jeffers*, 264 F.Supp.2d at 330; *accord Nichols v. Harford Cnty. Bd. of Educ.*, 189 F.Supp.2d 325, 342 (D.Md. 2002); *Newman v. Giant Food, Inc.*, 187 F.Supp.2d 524, 528-29 (D.Md. 2002); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (explaining that the imposition of discipline is not an adverse action unless it

18

materially alters the terms of employment).  Much like a poor

performance evaluation, the letter would only become an adverse

action "where the employer subsequently uses [it] as a basis to

detrimentally alter the terms or conditions of the recipient's

employment."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d

371, 377 (4th Cir. 2004); *accord Pulley v. KPMG Consulting, Inc.*,

348 F.Supp.2d 388, 394-95 (D.Md. 2004).  Smith has not pointed

to any bit of evidence indicating that the letter had any effect

on her employment.  Indeed, there were apparently no

consequences stemming from the letter at all.[9]

Because it was not an adverse action, Smith cannot rely on

the letter of caution to sustain a gender-based discrimination

claim.

---

[9]    In much the same way, even if they could properly be
considered, Garcia's alleged comments do not amount to an
adverse employment action.  There is no evidence that the
comments had any impact on the terms of Smith's employment.  The
alleged comments might have been frank or even harsh, but there
is no argument that the comments generated any of the typical
forms of adverse action: "discharge, demotion, decrease in pay
or benefits, loss of job title or supervisory responsibility, or
reduced opportunities for promotion."  *Bonne v. Goldin*, 178 F.3d
253, 255 (4th Cir. 1999).  And as a general matter, "disparaging
remarks made by a supervisor do not state an adverse employment
action."    *Blount  v.  Dep't  of  Health  &  Human  Servs.*,  400
F.Supp.2d 838, 842 (D.Md. 2004).

### 2. Circumstances Supporting Inference of Discrimination: Training, Travel, and Non-Selection

The Secretary also asserts that Smith has not established the fourth element of the prima facie case – circumstances supporting an inference of discrimination – with regard to the remaining claims. One of the most common ways to establish such circumstances is to point to a similarly situated comparator outside of the protected class who was treated differently. Of course, Smith is not *required* to summon such evidence; she may also point to any other circumstantial evidence suggesting discrimination. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003).

Here, Smith has failed to provide similarly situated comparators or any other circumstantial evidence supporting an inference of discrimination with regard to her non-selection for the Agriculturalist position. Indeed, Smith only references her non-selection in passing, suggesting that (1) her lack of training and travel "impacted all future potential promotions, including the GS-13 Trade position"; and (2) Garcia might have talked to Guidicipietro about her. Such speculative arguments are woefully insufficient, especially given that an inference of gender discrimination is undermined by the fact that another woman was selected for the position. *See Foreman v. Weinstein*, 485 F.Supp.2d 608, 610 n.1 (D.Md. 2007) (explaining, in the

failure to promote context, that the claim is "essentially moot" if the person promoted is in the same protected class as the plaintiff); *Sonpon v. Grafton Sch., Inc.*, 181 F.Supp.2d 494, 500 (D.Md. 2002) ("[C]ourts have held that a plaintiff did not satisfy the fourth prong of the test for failure to promote where applicants of the same race and gender as the plaintiff filled the positions for which he had applied.").

Smith also has not identified any circumstances giving rise to an inference of discrimination with regard to her alleged denial of training. She notes that a male employee who was not a safety officer was allowed to attend the Avian Influenza Conference, while she was not allowed to attend despite her relevant status as a safety officer. Unfortunately, Smith fails to provide any evidentiary support for the existence of this comparator. Moreover, even if the court were permitted or inclined to consider Smith's unsubstantiated view of the facts, the mere assertion that a male was permitted to attend the training is not enough. Putting aside the fact that it is not clear *who* exactly permitted the male employee to attend, Smith must provide some indication that the male employee was in a comparable position to Smith. "To be similarly situated and thus permit a valid comparison, the [male] employee[] must have dealt with the same supervisor, been subject to the same

standards, and have engaged in the same conduct" as Smith. *Duggan v. Sisters of Charity Providence Hosps.*, 663 F.Supp.2d 456, 468 (D.S.C. 2009). Smith has not established these relevant facts. In her opposition, Smith would seem to protest that she cannot present valid comparators because her work place was too small. If that is indeed the case, she must provide other circumstantial evidence or seek direct evidence. Having failed to do either, her claim cannot proceed.

Consequently, Smith's gender-based discrimination claims premised on her denials of training and travel and her non-selection for the GS-13 Agriculturalist position fail.

### 3. Pretext

Given that Smith has not established a prima facie case of gender-discrimination, there is no need to move through the rest of the *McDonnell Douglas* framework. Even if Smith had met her initial burden, however, her claim still would have largely failed. As the statement of facts makes clear, the Secretary has offered legitimate explanations for most of the challenged actions; while they need not be repeated in full, a brief survey confirms the point. Smith's requested training and travel was denied because of budget limitations and because her superiors placed higher priority on her visit to Fort Collins. Smith received a letter of caution because of an insubordinate email,

which even Smith now admits was a mistake. She did not receive the Agriculturalist position because another more-qualified candidate was selected. While Smith labels these explanations "excuses," she has not provided any *evidence* in support of that view. "[A] plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009). Smith has done neither.

Judgment will be entered for the defendant on the entire gender-based discrimination claim.

## C.    Retaliation

Title VII also prohibits an employer from retaliating against an employee who exercises his Title VII rights. 42 U.S.C. § 2000e-3. Smith claims the agency violated that prohibition by retaliating against her after she filed her first EEOC complaint.

Just like the discrimination claim, without any direct evidence, Smith may employ the *McDonnell Douglas* burden-shifting framework. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). To survive summary judgment under *McDonnell Douglas*, she needs to demonstrate three elements:    (1) she engaged in protected activity; (2) the agency took an adverse employment

action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Davis v. Dimensions Health Corp.*, 639 F.Supp.2d 610, 616 (D.Md. 2009); *accord Holland*, 487 F.3d at 218. Once that challenge is met, the Secretary must then provide a non-discriminatory explanation for the adverse action. The burden would then shift back to Smith to show the reason is pretextual. Recognizing that Smith engaged in protected activity in filing her first EEOC action, the Secretary focuses on the second and third elements of the prima facie retaliation case.

First, the government argues that several of the disputed events were not materially adverse. The definition of an adverse action "is simply not reducible to a comprehensive set of clear rules[,] . . . [but] the provision's standard for judging harm must be objective." *Thompson v. N. Am. Stainless, LP*, 131 S.Ct. 863, 868 (2011) (quotation marks omitted). Thus, an action is materially adverse if, from an objective point of view, "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). On the other hand, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor

annoyances, and simple lack of good manners.'" *Geist*, 671 F.Supp.2d at 738 (quoting *Burlington*, 548 U.S. at 68).

In opposing the Secretary's motion for summary judgment, Smith has suggested that the six discrete instances underlying these claims actually were part of "an ongoing pattern of discrimination and pretext." (ECF No. 12, at 4). The Secretary reads this argument as an attempt to amend the complaint to include a retaliatory hostile work environment claim (which, as noted above, Smith cannot do). The government maintains that such an argument "essentially concedes [its] arguments," as there is no hostile work environment claim in the complaint and Smith did not argue that any single act was materially adverse.

The Secretary's argument likely misconstrues the nature of an "adverse action" in the retaliation context. As the Supreme Court bluntly reminded courts in *Burlington*, "[c]ontext matters" in retaliation cases. 548 U.S. at 69. Thus, it behooves courts to "consider whether based upon the *combined effect* of alleged events, a reasonable worker could be dissuaded from engaging in protected activity." *Test v. Holder*, 614 F.Supp.2d 73, 84 (D.D.C. 2009) (quotation marks and ellipses omitted; emphasis in original); *see also Caldwell v. Johnson*, No. 1:09CV707, 2009 WL 2487850, at *10 n.13 (M.D.N.C. Aug. 13, 2009) (collecting cases). In other words, a court may consider the cumulative

effect of several allegedly retaliatory acts without converting the claim into a hostile work environment claim. Indeed, even before *Burlington*, courts seemed willing to recognize that retaliation may come in the form of a pattern of behavior, rather than a single discrete act. *See, e.g.*, *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 483 n.7 (7th Cir. 1996) ("We do not foreclose the possibility that another plaintiff might have a cognizable claim of retaliation based on acts which, although seemingly appropriate and nondiscriminatory when considered in isolation, bespeak retaliation when considered together."). Smith may therefore rely on the collective retaliatory force of these acts without having to amend her complaint.

The problem for Smith, though, is that even if one assumes that she suffered a materially adverse employment action, she has not established any causal link between the protected activity and the adverse action. This is principally so because none of the relevant decisionmakers here – Pasek, Sanderson, Fedchock, or Guidicipietro – apparently had knowledge of her prior EEO activity. Smith argues that two of the decisionmakers (Pasek and Sanderson) were on Garcia's staff and asserts that Guidicipietro sometimes talked with Garcia. She infers from these relationships that the decisionmakers must have known of

26

her protected activity because Garcia was aware of it; in fact, she goes so far as to accuse Garcia of "recruiting and directing his staff" to retaliate against her. (ECF No. 12, at 5). Yet without any evidence, that is too speculative an inference, particularly given that the relevant decisionmakers have all sworn to their lack of knowledge.[10] "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998); *accord Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001).[11]

---

[10]    Pasek says she learned in September 2007 that Smith had filed a "complaint" against Garcia, but she did not understand that it was EEO-related. (ECF No. 7-6, Pasek Dep., at 38-39).    That event happened after all of the allegedly retaliatory events.    In 2006, she also heard "rumors" that Smith might file a complaint against past supervisors, but did not understand that Smith had filed any such complaint. (*Id.* at 37-38).

[11]    Even if the court were to assume knowledge, there is nothing hinting at a connection between the protected activity and the adverse actions.    The adverse actions here are separated by several months and the passage of time tends to negate an inference of retaliation. *See Price*, 380 F.3d at 213.    Although other relevant evidence may be used to support a causal connection where temporal proximity is lacking, *Lettieri v.*

It also bears repeating that, as explained above, the Secretary has provided legitimate, non-discriminatory reasons for many of the challenged actions. As with her discrimination claim, Smith has failed to provide evidence (or even a forecast of evidence) that these reasons are pretext.

Judgment for the Secretary will be entered on the retaliation claim.

**IV. Conclusion**

For the foregoing reasons, Defendant's motion, construed as a motion for summary judgment, will be granted.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

*Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007), Smith has not provided such evidence here.